## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 15-20241-CR-KING/TORRES

UNITED STATES OF AMERICA,

      Plaintiff,

v.

JOSE LUIS MORALES,

      Defendant.

_____/

### REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS PHYSICAL EVIDENCE AND STATEMENTS

This matter is before the Court on Defendant's Motion to Suppress Physical Evidence and Statements ("motion"). [D.E. 22].[1] The Court reviewed the motion, the government's response [D.E. 28] and held an evidentiary hearing regarding this motion on June 23, 2015. For the following reasons, Defendant's Motion should be **DENIED**.

### I.    BACKGROUND

On April 9, 2015, Defendant Jose Luis Morales ("Defendant") was indicted for being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). [D.E. 7]. Defendant is also charged as an Armed Career Criminal pursuant to 18 U.S.C. § 924(e). Defendant moves to suppress the physical evidence recovered from his

---

[1]    On May 20, 2015, Judge King referred this motion to the undersigned Magistrate Judge for disposition. [D.E. 24].

residence on March 26, 2015, as well as any oral statements made after his arrest on that date as the result of an unlawful search and seizure in violation of the Fourth Amendment. Defendant argues that the evidence should be suppressed because he did not consent to a search of the residence and that Ms. Berta Lang's third party consent was not voluntarily given. The government contends, however, that law enforcement obtained legal and voluntary consent from Ms. Lang to search the residence, which by definition renders the search and seizure reasonable. We rest our decision on the testimony and facts presented during the June 23, 2015, evidentiary hearing.

## II.    FINDINGS OF FACT

On March 26, 2015, at approximately 9:30 p.m., officers from the Miami Gardens Police Department, along with members of the Multi-Agency Gang Task Force, conducted neighborhood operations in response to complaints of drug and narcotics activity in various areas of Northern Miami-Dade County.  One such area targeted by task force officers was the neighborhood where Defendant lived, 4121 Northwest 181st Terrace.

The area around 4121 Northwest 181st Terrace had experienced a number of gun and drug related incidents within the previous six months. Miami Gardens Detective Phillip Torres testified that in December 2014 he was assigned a drug complaint from an anonymous tip which alleged that a white Hispanic male had been selling drugs from that same address. His investigations linked the Defendant to the complaint and the address.  Although it was not planned as such, as it turns

out the first neighborhood targeted by these task force officers was this same area, and Detective Torres was on that task force.

Upon arrival at the scene on March 26, 2015, Detective Torres and other law enforcement officers (anywhere from ten to twenty in numbers) observed several males standing to the east side of the residence located at this address. Officers made contact with the group of males, which included Defendant. While officers were questioning the males, a woman appeared at the front door of the residence, looked to the side of the house and re-entered the residence. Defendant advised officers that the woman was his mother-in-law, who was the lease holder of the residence.[2]

Detective Torres went to the front door of the residence and knocked several times but no one answered, according to him.  The occupant, Ms. Lang, testified differently.  She claimed that she heard the knocking but refused to open the door as she said she would do so only if the officers had a warrant.  In any event, Detective Torres ceased knocking and reported to Sergeant Diana Hedrick that there was someone inside the residence but he received no answer when he knocked on the door. Sergeant Hedrick advised Detective Torres to knock again and take Miami Dade Sergeant Jorge Rodriguez, a Spanish speaking officer, with him. When Detective Torres approached the front door, with Sergeant Rodriguez, he knocked at least six times, stating "Police!" after every second knock. Both officers were in plain

---

[2]     The woman, later identified as Ms. Berta Lang, is the mother of Defendant's girlfriend. However, Defendant refers to Ms. Lang as his mother-in-law. Defendant and Ms. Lang's daughter are not married.

clothes, had tactical vests and police belts with firearms. Sergeant Rodriguez's vest had "Sheriff" on the front and the back, along with a gold badge affixed to his police belt, while Detective Torres had "Police" written on his vest.

After the sixth attempt, Ms. Lang opened the door. Sergeant Rodriguez introduced himself and Detective Torres, in Spanish, and asked if they could come inside to speak with her regarding an investigation they were conducting.[3] Ms. Lang allowed the officers to enter the living room, which was the first room after the front door entrance.[4] In Spanish, Sergeant Rodriguez advised Ms. Lang that they were conducting their investigation and asked her permission to search the house for contraband. Ms. Lang responded that the officers could go ahead as she had nothing illegal in her home. She stated that she was the leaseholder of the residence and that her daughter, Defendant, and their two children all resided in the house with her. She further stated that she watched the children daily; therefore, she entered the bedroom that her daughter and Defendant sometimes shared to provide care for her grandchildren who also slept in that room. She also

---

[3]     Ms. Lang is a Spanish speaker. Because Sergeant Rodriguez was a Spanish speaking agent, all communications were translated through Sergeant Rodriguez.

[4]     During the hearing, Ms. Lang testified that when the officer first knocked, she told him that he could not enter unless he had a "search order" to enter her house. When the officers knocked a second time, she testified that the officers came into the house. The officers were never asked directly if this was true, nor were they asked to refute the testimony of Ms. Lang's neighbor, Ms. Roman, who credibly testified that she heard officers at Ms. Lang's front door saying "I have a warrant to search the premises." To be fair, however, we do not fully know the context of the communication that Ms. Roman overheard, nor whether that communication occurred before or after Ms. Lang had already granted the officers permission to enter the residence.

routinely cleaned the bedroom. Ms. Lang had free access to all the rooms in the residence and no rooms had locks on the doors. No one else was present in the home other than Ms. Lang's two minor grandchildren.

Sergeant Rodriguez credibly testified that he explained to Ms. Lang that she could refuse to give consent to search without a search warrant. Ms. Lang responded that the officers could go ahead and, again, stated that she had nothing to hide.

After Ms. Lang gave the officers verbal consent to search, Sergeant Rodriguez informed Sergeant Hedrick that they had obtained permission to search the residence. Sergeant Hedrick requested that a K-9 officer perform the search of the residence. Officer Jeff D'Agostinis responded and insisted that the officers obtain written consent prior to having his K-9 officer ("Bond") enter the residence. Sergeant Hedrick did not have a consent to search form written in Spanish but found a consent form in English. Sergeant Rodriguez used that form and proceeded to translate the consent form in its entirety for Ms. Lang and, again, informed her that she could refuse the search and stop consent. Ms. Lang signed the consent form for the search of the residence. The English form clearly provides that "[y]ou may refuse to consent to a search and may demand that a search warrant be obtained prior to any search of the premises or vehicle described below." (Gov. Exh. 2). Both Sergeant Rodriguez and Detective Torres testified that during their interaction with Ms. Lang they did not use or display their firearms, did not restrain her, and did not act in any way to threaten or coerce her.  Ms. Lang corroborated that testimony.

Once the form had been signed, Officer D'Agostinis brought in the K-9 Bond to perform the search of the residence. Ms. Lang attended to her grandchildren at that time. They sat in the living room while the search was conducted and Sergeant Rodriguez stayed in the living room with them.

During the search of the residence, Bond alerted to the bottom left side of the closet in the front bedroom of the residence. Law enforcement officers observed a red bag and clothing on the floor on the left side. Officers proceeded to unzip the bag and observed a black airsoft pistol, a silver .38 caliber revolver, and four (4) live .38 caliber rounds. Law enforcement officers recovered the bag and told Ms. Lang about what they had uncovered. Ms. Lang told the officers that the firearm did not belong to her and that she had no knowledge that the firearm was in the residence. She further informed the officers that Defendant and her daughter slept in the front bedroom. Ms. Lang's daughter arrived at the residence and informed the officers that the firearm belonged to Defendant.

Defendant was arrested and transported to the Miami Gardens Police Department. After being read his *Miranda* rights, Defendant gave a recorded statement admitting that the firearm found on the scene belonged to him. Defendant said that he found the firearm near his house and decided to keep the firearm for protection. Defendant further stated that he knew he was a convicted felon and prohibited from possessing a firearm.

The pending motion seeks to suppress the objects found during the K-9 search of the residence and Defendant's subsequent confession.

### III.    ANALYSIS

**A.    _Was Ms. Lang Seized through Acquiescence?_**

Defendant asserts that Ms. Lang did not voluntarily consent to a search of the house.  Defendant claims that police officers forced their way in his residence, lying about the presence of a warrant and commanding Ms. Lang to open the door, which led to her involuntary acquiescence in opening the door. Under these circumstances, Defendant contends, Ms. Lang provided consent only after an unconstitutional seizure that was the product of a claim or show of authority and, as a result, the consent was not voluntary. Therefore, we must first address whether Ms. Lang's initial opening of the door was a permissible "knock and talk," or whether her acquiescence reflected an unconstitutional seizure by law enforcement agents in violation of the Fourth Amendment.

We begin with the understanding that the government, as always, has a heavy burden of defending a warrantless entry into a person's home.  "The general requirement that a search warrant be obtained is not lightly to be dispensed with, and the burden is on those seeking an exemption from the requirement to show the need for it . . . ." _United States v. Santa,_ 236 F.3d 662, 669 (11th Cir. 2000) (internal quotation marks, quotations omitted); _see also United States v. Blasco,_ 702 F.2d 1315, 1325 (11th Cir. 1983) ("Because the protections of the fourth amendment are crucial to a free and viable society, the government shoulders a heavy burden of justifying the failure to obtain a warrant prior to the intrusion."); _Kyllo v. United States,_ 533 U.S. 27, 31 (2001) ("With few exceptions, the question whether a

warrantless search of a home is reasonable and hence constitutional must be answered no.").

In the recent Supreme Court case of *Florida v. Jardines*, the Court's opinion acknowledged the long standing rule that police, without a warrant, can lawfully approach a home "to knock on the front door in the hopes of speaking with" the resident based on the theory of license. 133 S. Ct. 1409, 1412 (2014) (citing *Kentucky v. King*, 131 S. Ct. 1849 (2011)). "Complying with the terms of that traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters." *Id.* at 1415.

In this case, there was no obstruction to accessing the door which police knocked on. Even the most uncommitted Girl Scout would find it easy to approach Ms. Lang's door; hence, we find the police lawfully knocked on Ms. Lang's door during their first attempt to communicate with the occupants.

But just because the police were initially lawfully at the door to seek a "knock and talk" does not end the inquiry because the record is undisputed that Ms. Lang did not open the door when Detective Torres first approached.  The record shows that another round of knocking, this time with two armed officers at the door announcing their presence as "Police!", was required  before  Ms. Lang opened the door.  The government must thus also prove that Ms. Lang's opening of the door, and the officers' subsequent entry past the threshold of the residence, was obtained by consent freely and voluntarily given, "a burden that is not satisfied by showing a mere submission to a claim of lawful authority." *Florida v. Royer*, 460 U.S. 491, 497

(1983). "Citizens do not forfeit their constitutional rights when they are coerced to comply with a request that they would prefer to refuse." *Florida v. Bostick*, 501 U.S. 429, 438 (1991). The government must show, by a preponderance of the evidence, that the consent was unequivocal, specifically and intentionally given, and uncontaminated by any duress or coercion. *Royer,* 460 U.S. at 497-98.

In *Kentucky v. King*, the Supreme Court clarified the scope of the police's ability to investigate at the door of a citizen's home:

> When law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do. And whether the person who knocks on the door and requests the opportunity to speak is a police officer or a private citizen, the occupant has no obligation to open the door or to speak. When the police knock on a door but the occupants choose not to respond or to speak, "the investigation will have reached a conspicuously low point" . . .

131 S. Ct. 1849, 1862 (2011) (internal citation omitted).

In this case, the government's investigation reached its "low point" when Ms. Lang refused to answer the door after Detective Torres first knocked on it. Without any exigency present, Ms. Lang was entitled to "stand on [her] constitutional rights" and not answer the door. *Id.* The police did not simply knock on the door and invite a conversation—they employed tactics leading to Ms. Lang's submission to lawful authority.  As Sergeant Torres readily admits, his initial attempt at a knock and talk was met with Ms. Lang's exercise of her constitutional right not to answer the door without a warrant (whether she said as much or not).

The officers present at the scene, however, refused to back down and accede to Ms. Lang's refusal to open the door.  Detective Torres was ordered to persist in

his efforts to obtain cooperation, which undoubtedly included consent to search the premises.  And it was only after Sergeant Torres came to the door a second time on his superior's command and knocked six more times, while he and Sergeant Rodriguez announced their presence, that Ms. Lang answered the door. We find that Ms. Lang was exercising her rights protected by the Fourth Amendment and only opened the door upon the officers' indirect command to do so.  A reasonable person could only conclude that the multiple visits to the door and identification as police was a command to open the door, at least where no other qualifying language or instructions were given.

The facts here are analogous to an oft-cited Eleventh Circuit case, *United States v. Edmondson,* 791 F.2d 1512 (11th Cir. 1986).  In *Edmondson,* the Eleventh Circuit held that a defendant's consent to officers' warrantless entry into his residence was prompted by a show of official authority rather than uncoerced consent.  Several F.B.I. agents went to a suspect's door, with weapons drawn, identified themselves as agents, and then ordered the suspect to open the door.  The suspect responded by opening the door, stepping back into his house with his hands on his head, following which the officers entered the residence and arrested the suspect.  The district court found, and the Eleventh Circuit agreed, that the suspect's decision to open the door was acquiescence to lawful authority even though "[t]here is no direct evidence that defendant actually saw officers' drawn weapons.  However, the defendant was aware there were F.B.I. agents at his door and at the bottom of the stairs. The presence of a number of officers tends to

suggest an undertaking that is not entirely dependent on the consent and cooperation of the suspect." *Id.* at 1515. The critical dispositive fact in *Edmondson* was the particular nature of the officers' command to the suspect. The agents did not ask for the suspect's cooperation, did not simply ask for a chance to talk, and did not confer any indication to the suspect that he was free to ignore their request. Instead, the officers' command was unequivocal – "F.B.I. agents, open the door!"

Functionally the same facts are present here. Ms. Lang clearly evidenced her intent not to open the door when the officers identified themselves. Ms. Lang only acquiesced to the officers' authority after their repeated attempts to obtain a response, *not* pursuant to voluntary consent that was as product of unconstrained and uncoerced choice. Here, accepting as true what Detective Torres said, his six "loud" knocks on the door after having received no answer the first time was not an invitation for a discussion in the form of a knock and talk. He conceded that he used no other command but "Police!" Given that persistence by the police to open the door, a reasonable person would not believe they had the option not to do so. *See also United States v. Tovar-Rico,* 61 F.3d 1529, 1535 (11th Cir. 1995) (acquiescence found where officers went to the home of a suspect and began to knock loudly at the door, identifying themselves through the closed door, and instructing occupants to open the door); *United States v. Pekar,* 315 F.2d 319, 325 (5th Cir. 1963) (acquiescence found where F.B.I. agents knocked on a suspect's hotel room door and stated that they wanted to speak with him regarding their investigation; after occupant did not answer or open the door, agents waited and tried again with

commands identifying themselves as F.B.I. agents; Court of Appeals found that the decision to open the door was merely a response to an "aura of officialdom."); *cf. United States v. Willis,* 759 F. 2d 1486, 1493, 1498 (11th Cir. 1985) (no coercion found where the officer telephoned defendant, identified himself as a police officer, and asked if he could speak to the defendant face to face, to which the defendant responded "okay;" officers then knocked on the defendant's room, and he answered the door and said "come in."); *Tobin v. United States,* 923 F.2d 1506 (11th Cir. 1991) (no coercion found even though "[i]f the circumstances indicate that [the occupant] opened the door in response to a "show of official authority," then [he] cannot be deemed to have consented . . ."; but "[i]n calling out to the occupants of the house, the agent did not use the imperative . . . he phrased his words in the form of a request.  The occupants were free to deny that request or alternatively talk to the agent through the closed door.  The decision to open the door was therefore voluntary.").

Therefore, whether or not the police lied and falsely represented they had a warrant does not make a difference in our analysis. We conclude that Ms. Lang only acquiesced do to the "aura of officialdom" the police created in persistently knocking and identifying themselves as police. Their actions and commands, at that late hour, did not constitute requests for cooperation but, instead, communicated their determination to get the occupant to open the house and let them in.  Thus, Ms. Lang's opening of the door was not voluntary, and her acquiescence in doing so violated her right to be free from unreasonable searches and seizures in her home.

**B.**     ___Whether Written Consent was an Intervening Event___

As we have now determined that the initial entry by law enforcement was unlawful, we must turn our attention to the effect that Ms. Lang's subsequent consent to search has on the Fourth Amendment analysis. The Eleventh Circuit directs that that courts are "required to conduct two separate inquires where a consent to search follows prior illegal activity by the police officer." *United States v. Delancy*, 502 F.3d 1297, 1308 (11th Cir. 2007). "First, a court must determine whether consent was voluntary. Second, the court must determine whether the consent, even if voluntary, requires exclusion of the evidence during the search because it was the 'fruit of the poisonous tree' – the product of an illegal entry." *Id.* (citation omitted). This two step approach is mandatory, and the government bears the burden on both issues. *Id.*

This second issue, as framed by *Delancy*, is: "[w]hether the illegal entry tainted [Defendant's] consent so that the evidence found *after* the consent should be excluded." *Id.* at 1309. (emphasis in original). The inquiry is fact-specific, and three factors are especially helpful in resolving the question: "1) the temporal proximity of the seizure and the consent, 2) the presence of intervening circumstances, and, particularly, 3) the purpose and flagrancy of the official misconduct." No single factor is dispositive and must be reviewed in light of the circumstances. *Id.*

The first factor – temporal proximity – relates to the time elapsed between the putatively illegal entry and when Defendant consented to the search. This issue exists on a sliding scale: a short time weighs in favor of exclusion, while a long time

weighs against exclusion. *Id.* at 1310. The record provides a time line of the interaction between the officers and Ms. Lang: the officers entered the home, received a verbal consent from Ms. Lang to search the home, left to retrieve a written consent form, and proceeded to translate the consent form for Ms. Lang. However, the record is not entirely clear as to exactly how much time passed between the entry and obtaining the written consent.  Given that the burden is on the government, the temporal proximity factor favors the Defendant's position.

But absolute certainty about the amount of time between the entry and consent is not dispositive; the character of the interaction between law enforcement officers and the individual can be determinative.  *United States v. Smith*, 688 F.3d 730, 739 (11th Cir. 2012). When the interaction between the officers and individual is highly intrusive, the amount of time elapsed is less likely to attenuate the taint of the illegal entry. *Id.* at 740; *e.g., United States v. Santa*, 236 F.3d 662, 666 (11th Cir. 2000) (holding that two to three minutes between officers kicking in the locked front door of an apartment, entering with guns drawn then handcuffing the defendant before receiving consent to search was not a significant lapse of time to dissipate the taint). When there is a less intrusive interaction, an individual's consent may be sufficiently attenuated even if the time between is relatively short. *Smith*, 688 F.3d at 740; *e.g.*, *Delancy*, 502 F.3d at 1311 (holding that despite 10 to 20 minutes between officers conducting an unlawful protective sweep and asking for consent to search the home, the consent was untainted because interaction was conversational and without force or threats).

The interaction between Ms. Lang and the officers is similar to the interaction in *Delancy*. The officers spoke to Ms. Lang in a conversational tone, their weapons were holstered, and the officers never threatened or coerced her. The facts suggest that a relatively short amount of time elapsed between the entry and the consent and that the interaction was non-intrusive, which ultimately renders the issue neutral and weighs in favor of neither party.

The second factor relates to whether an intervening circumstance or event interrupts the casual connection between the illegal entry and Defendant's consent. *Delancy*, 502 F.3d at 1311. In *United States v. Brache*, for instance, officers sat down with the defendant at the dining room table and translated the form for the defendant, in Spanish. 543 F. App'x. 930, 932 (11th Cir. 2013). The written consent form explicitly stated that he had the right to refuse consent. *Id.* The defendant appeared to understand and signed the consent form. In affirming this Court's determination, the Eleventh Circuit held that the subsequent written consent to the search was voluntary and a significant intervening factor, meaning that any taint from the illegal entry was purged by the intervening circumstances of the consent. *Id.*

Like *Brache*, here a well-recognized intervening circumstance occurred: Ms. Lang executed a written consent form. Sergeant Rodriguez translated the form for Ms. Lang from English to Spanish. The form unequivocally and expressly advised Ms. Lang of her right to refuse consent, but she granted permission anyway.

Because Ms. Lang executed a written consent to search form, it is a sufficient intervening circumstance to dissipate any taint from an illegal entry.

Finally, the third factor relates to whether the purpose and flagrancy of the official conduct demonstrates that the illegal search was pretextual and designed solely to obtain consent to perform a more thorough search. *Id.* Detective Torres testified that the sole purpose of speaking to Ms. Lang was to corroborate the information that Defendant resided at that residence. The officers state that the purpose was to conduct a "knock and talk" to gain more information. The question is whether the officers acted so flagrantly or with such force to render Ms. Lang unable to deny consent to search. All witnesses testified that the officers spoke to Ms. Lang in a conversational tone and their guns were not drawn at any point in time. The officers did not restrain Ms. Lang in any way, and Sergeant Rodriguez took the time to translate the consent form for her. The actions taken by the officers were not so overbearing, aggressive or offensive to suggest that Ms. Lang was unable to exercise her free will to deny consent. The record does not contain any material evidence to suggest that agents acted in a flagrant fashion while inside the residence that would warrant exclusion of evidence.

On balance, the three factors, viewed in context with the totality of the circumstances, weigh in the government's favor. Accordingly, we conclude that the taint, if any, associated with the putative illegal entry (assuming it was indeed unlawful) and while close in time to obtaining the consent, was sufficiently remedied by the process of acquiring Ms. Lang's written consent and minimized by

the agents' conduct before and during the acquisition of Ms. Lang's consent. *See Delancy*, 502 F.3d at 1313-14.

### C.    *Did Ms. Lang Have the Authority to Consent?*

Warrantless entries into a person's home are presumptively unreasonable. *Payton v. New York*, 445 U.S. 573, 586 (1980). However, the search of a property without a warrant, but with proper consent voluntarily given, is a valid exception under the Fourth Amendment. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). And a third party may give valid consent if he or she has "common authority over or other sufficient relationship to the premises or effects sought to be searched." *United States v. Matlock*, 415 U.S. 164, 171 (1974).

Whether consent is given voluntarily is determined by the totality of the circumstances. *Schneckloth*, 412 U.S. at 219; *United States v. Robinson*, 625 F.2d 1211, 1218 (5th Cir. 1980). In determining voluntariness, the Court considers several factors, including: the presence of coercive police procedures, the extent of the person's cooperation with the officer, the person's awareness of his right to refuse consent, the person's education and intelligence, and the person's belief that no incriminating evidence will be found. *United States v. Purcell*, 236 F.3d 1274, 1281 (11th Cir. 2001); *United States v. Ramirez-Chilel*, 289 F.3d 744, 752 (11th Cir. 2002). The knowledge of the right to refuse consent is a factor to be considered in the voluntariness of consent, but the government does not need to establish it in order to show that consent search was lawful. *Schneckloth*, 412 U.S. at 248-49; *United States v. Zapata*, 180 F.3d 1237, 1241 (11th Cir. 1999).

Defendant does not argue that Ms. Lang did not have the authority to consent to the search of the residence; he simply states that he was present at the scene and the officers did not attempt to get his consent to search. The Defendant seeks to analogize the situation to *Georgia v. Randolph*, where the defendant was physically present at the door and had already refused to give consent when the defendant's estranged wife gave police permission to search the residence. 547 U.S. 103 (2006). The Court there held that a physically present co-occupant's stated refusal to permit entry renders a warrantless entry and search unreasonable. *Id.* However, Defendant here was not present at the door when the officers spoke with Ms. Lang, and he never refused consent. The main difference is that Defendant was never asked for his consent. He may have been physically present at the scene but he was not involved in the conversation between the officers and Ms. Lang and he did not refuse consent prior to the conversation. Nor did he volunteer his non-consent at any point.

The facts here are more akin to *United States v. Matlock*, where the defendant was arrested and removed from the front yard of the house and was not asked for consent to search, while the officers sought and received consent to search from his girlfriend who was the leaseholder of the residence. 415 U.S. at 164. The Court held that the officers only need voluntary consent; it is not limited to the defendant and can be obtained from a third party who possessed common authority over the premises. *Id.* at 171. As in *Matlock*, the officers here did not attempt to

obtain consent from Defendant, but did obtain consent from Ms. Lang in her capacity as a third party that had common authority.

This record is also similar to *United States v. Zarabozo*, where the defendant's mother had apparent authority to consent to search of the defendant's room as she was the leaseholder and she often cleaned the room. 378 F. App'x 939, 941 (11th Cir. 2010) (motion to suppress denied as mother's consent to search was valid). Here, Ms. Lang is the leaseholder of the residence where Defendant lives with her and her daughter. Ms. Lang frequently takes care of her grandchildren who occupy the same bedroom as Defendant and her daughter. Ms. Lang has full access to all rooms in the house, including Defendant's bedroom, as there are no locks on the doors, she takes care of the children who are frequently in the room, and she enters the room to clean. These facts establish that Ms. Lang had common authority over the residence and thus her consent is valid.

Defendant's main contention is that Ms. Lang's consent was not given voluntarily. Defendant argues that because of the number of police officers, together with the fact that Ms. Lang does not speak or read English, Ms. Lang's consent could not have been voluntary. Yet, we must consider the totality of the circumstances to determine voluntariness. When Ms. Lang engaged the officers, there were only two officers present: Sergeant Rodriquez and Detective Torres. Sergeant Rodriquez, who is fluent in Spanish, explained the situation to Ms. Lang, in Spanish. Ms. Lang had full knowledge and understanding of why the officers were there; thus there was no language barrier which could lead to a

misunderstanding between them. Sergeant Rodriguez then translated the English consent form into Spanish, in part to make sure that Ms. Lang understood. The officers repeated to her when she gave both verbal and written consent that she could refuse to give consent if she wanted, and she told them that she understood and was giving them consent. This goes above and beyond what the Supreme Court held in *Schneckloth*, where the Court held that consent was voluntary even if the individual was not told that they could refuse consent. 412 U.S. at 248-49. Here, the officers told Ms. Lang multiple times that she could refuse the search, but it did not change her decision to allow the officers into the residence. Ms. Lang voluntarily gave verbal consent twice and then provided written consent to allow the officers to search the residence. The officers did not use coercive police procedures in order to obtain Ms. Lang's consent. Based on the totality of the circumstances, Ms. Lang's consent was given voluntarily.

## *IV.   CONCLUSION*

While the initial entry into Ms. Lang's home was an illegal entry, the subsequent written consent was both voluntary and valid under third party consent. The written consent obtained from Ms. Lang dissipated the taint of the initial illegal entry into the residence. Accordingly, Defendant's Motion to Suppress Physical Evidence and Statements should be **DENIED.**

Pursuant to Local Magistrate Rule 4(b), the parties have until Noon, June 25, 2015, to raise written or oral objections, if any, with the Honorable James Lawrence King, Senior United States District Judge. The Court finds good cause to expedite

the objection period in light of the imminent trial date. Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and bar the parties from attacking on appeal the factual findings contained herein, if any. *R.T.C. v. Hallmark Builders, Inc.,* 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger,* 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright,* 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc); 28 U.S.C. § 636(b)(1).

**DONE AND SUBMITTED** in Chambers at Miami, Florida this 24th day of June, 2015.

 */s/ Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge